IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

LOUIS DOODY,                             )    CIVIL NO. 08-00285 JMS/BMK
                                         )
                    Plaintiff,           )    ORDER GRANTING DEFENDANTS'
                                         )    MOTION FOR SUMMARY
             vs.                         )    JUDGMENT
                                         )
PENGUIN GROUP (USA) INC., a              )
Delaware corporation; SANDECKER,         )
RLLP, a Colorado Limited Liability       )
Limited Partnership; CLIVE               )
CUSSLER; DIRK CUSSLER; JOHN              )
DOES 1-10, JANE DOES 1-10; DOE           )
CORPORATIONS 1-10; DOES                  )
PARTNERSHIPS 1-10; and DOE               )
ASSOCIATIONS 1-10,                       )
                                         )
                    Defendants.          )
_____          )

## ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

In 2003, Plaintiff Louis Doody ("Plaintiff") sent a manuscript of his copyrighted fictional novel *Gold of the Khan* to Defendant Penguin Group (USA) Inc. ("Penguin") for its consideration. The manuscript tells the story of a Boston history professor, Marya Bradwell, who searches for and finds Marco Polo's lost treasure hidden in a church in Croatia. Penguin ultimately rejected Plaintiff's manuscript, but Plaintiff contends that protected elements of his manuscript were

copied and incorporated into several action adventure novels written by best-selling authors Clive Cussler and Dirk Cussler including *Treasure of Khan*, *Trojan Odyssey*, *Golden Buddha*, *The Navigator*, and *Lost City* (collectively, the "Cussler Books").  Plaintiff therefore alleges claims against Defendants Penguin, Sandecker RLLP, Clive Cussler, and Dirk Cussler (collectively "Defendants") for copyright infringement, conversion, unfair and deceptive trade practices, and breach of implied contract.

Currently before the court is Defendants' Motion for Summary Judgment, in which they argue that the copyright infringement claim should be dismissed because *Gold of the Khan* and the Cussler Books are not similar in any of their protected elements, and the state law claims should be dismissed because they are preempted by federal law and otherwise lack merit.  Based on the following, the court GRANTS Defendants' Motion for Summary Judgment.

## II. <u>BACKGROUND</u>

**A.    Factual Background**

### *1.    Plaintiff and Defendants*

Plaintiff, a retired high school teacher, drafted *Gold of the Khan* during the summer of 2002 to February 2003.  Pl.'s Decl. ¶ 5.  Plaintiff subsequently attempted to get *Gold of the Khan* published and first registered it

2

with the United States Copyright Office.  *Id.* ¶¶ 6, 8-9; Pl.'s Ex. 7.  Plaintiff then submitted a synopsis of *Gold of the Khan* to Topaz, a division of Penguin, in response to a solicitation inviting writers to submit synopses of "historical titles." Pl.'s Decl. ¶ 6; Pl.'s Ex. 6.

In response to Plaintiff's synopsis, Penguin requested and Plaintiff provided the entire manuscript of *Gold of the Khan* in both hard copy and compact disc form.  *See* Defs.' Ex. B.  In a May 21, 2003 letter, editorial assistant Rose Hilliard rejected *Gold of the Khan* for publication.  Pl.'s Ex. 8.  While she enjoyed the story, Hilliard found the plot of *Gold of the Khan* uneven and weighed down by contemporary Asian politics, the dialogue stilted, and the characters lacking in clear motivations.  *Id.*  Hilliard offered, however, to read a revised version and Plaintiff submitted a new version in August 2003.  Pl.'s Decl. ¶ 14; Defs.' Ex. C.

In a February 9, 2004 letter, Hilliard again rejected *Gold of the Khan.* Hilliard stated that while she requested "a few reads on this when the manuscript first came in, [] the general consensus was that Marco Polo wasn't a big enough draw for the soft historical fiction market."[1]  Pl.'s Ex. 9.  Plaintiff never received his compact disc back, and never heard anything more from Penguin.  Pl.'s Decl.

---

[1]  Hilliard nonetheless asserts that she did not actually ask anyone else to read the manuscript, but rather polled her co-workers to see if they believed Marco Polo would have appeal.  Pl.'s Ex. 19, at 35-36.

¶ 17.  In 2006, Plaintiff saw *Treasure of Khan* in a bookstore and believes that it, along with the other Cussler Books, have substantial similarities to *Gold of the Khan.  Id.* ¶ 18.

Clive Cussler, one of the authors of the Cussler Books, is a famous adventure novelist who has written over 17 books that have reached the *New York Times* fiction best-seller list.  Given his volume of books, Clive Cussler has admitted that it is "getting harder" to come up with ideas and maintain originality between books.  *See* Pl.'s Exs. 4, 5.  Clive Cussler, his fellow authors, and his editors all deny, however, that they received or reviewed *Gold of the Khan* at any time prior to this lawsuit.  *See* Defs.' Exs. O, P, Q, R.

## 2.  *The Books at Issue*

### a.  *Gold of the Khan*

In Plaintiff's *Gold of the Khan*, Dr. Marya Bradwell, a Massachusetts professor in Asian History, fulfills her lifelong pursuit of finding Marco Polo's lost treasure and in the process, falls in love with antiquities dealer Liam Di Angelo.[2]

Bradwell always believed that Marco Polo had brought back treasure from his adventures advising Kublai Khan, including the "Tablets of Command,"

---

[2]  Plaintiff submitted two versions of *Gold of the Khan* to Penguin.  While there are differences between the two, the overall story remains the same.  The court therefore provides this summary as a general overview only.

4

golden tablets Kublai Khan gave Marco Polo to secure his safe passage back to Italy.  Bradwell's theory gets jump-started when her research assistant in Italy, Vittoria, finds a letter from Marco Polo's confessor stating that he gave Marco Polo's journal to one of Marco Polo's daughters, and finds the journal in a convent in Venice.  Bradwell has no funding because her department does not believe that her theories have merit, but her colleague Dr. Argawal offers financial support in exchange for being kept apprised of her progress.  Bradwell accepts his offer and heads off to follow the clues in the journal to find the Tablets of Command.

On her way to Italy, Bradwell meets and has several awkward encounters with Di Angelo.  While their chemistry cannot be denied, Bradwell does not like Di Angelo's willingness to support tomb raiders for fast money. Bradwell accepts his offers of help, however, after she learns that Vittoria was attacked, is later chased herself, and finds her room ransacked.  Di Angelo takes Bradwell to the Bellardos, his source of antiquities in Venice, and also steals Marco Polo's journal out of the convent for her.  The journal reveals that Marco Polo made a large donation to a church in Korcula, Croatia, so Bradwell and Di Angelo head there together.

In Korcula, Bradwell's search for the Tablets of Command is derailed when she is kidnapped and spirited away to a palace in Kashgar, located in

Western China.  There, Bradwell meets "the Khan," a drug lord bent on having the Tablets of Command and uniting all of Central Asia, and who is helped by none other than Argawal.  Argawal and the Khan threaten Bradwell that she must help them or die.

In the meantime, Di Angelo returns to Venice and gets help from the Bellardos to save Bradwell.  They devise a plan to lure Bradwell's captors with Scythian artifacts that the Khan has been purchasing and to offer to trade Bradwell for the journal.  Their plan works, and to Bradwell's delight, Di Angelo uses only a copy of the journal for the switch.

Bradwell and Di Angelo return to Korcula, where Bradwell realizes that the Tablets of Command are hidden in the cross in the belltower of St. Mark's church, and the remaining treasure is hidden in a mural depicting Marco Polo and a Chinese princess he fell in love with.  Bradwell and Di Angelo scale the tower to reveal the Tablets of Command and are confronted by Argawal, who falls to his death.  In the end, Marco Polo's treasures are put on display for the world to see, Bradwell becomes a media sensation, and Di Angelo proposes marriage.

b.    *The Cussler Books*

All of the Cussler Books at issue involve high-stakes, fast-paced action adventure in the vein of James Bond, MacGyver, Indiana Jones, and

Mission Impossible, but with a focus on technology and the ocean.  All of Cussler's main characters are similar in that they manage to overcome even the most dire of life-threatening situations using their tenacity and ingenuity with witticism and aplomb.  Except for *Golden Buddha*, all of the Cussler Books at issue involve characters that work for the fictional government agency the National Underwater and Marine Agency ("NUMA"), an oceanic research and investigation organization.  Both *Treasure of Khan* and *The Navigator* follow Dirk Pitt and his sidekick Al Giordano, the *Navigator* and *Lost City* follow Kurt Austin and his sidekick Joe Zavala, and *Golden Buddha* follows Juan Cabrillo, a chairman of an elite team of mercenaries housed in a high-tech boat.  All of these books also follow a familiar pattern of providing a prologue of some event in the past, which ties to the events in the present.

i.    <em>Treasure of Khan</em>

In *Treasure of Khan*, published in 2006 and written by Clive and Dirk Cussler, Pitt and Giordano foil an evil plot by a Mongolian oil tycoon to disrupt the world's oil supplies and along the way discover the tombs of Genghis Khan and Kublai Khan.

In the prologue, in 1291, a Mongolian commander finds what the reader later learns to be Hawaii, and in 1937, an archeologist finds and quickly

7

loses a map to Genghis Khan's tomb and a cheetah skin.  In the present time, Pitt and Giordano meet a team of oil surveyors after they save the surveyors from a seiche wave on Lake Baikal, Siberia.  While the surveyors are with Pitt and Giordano, Tolgio Borjin, president of a Mongolian oil company, manages to have the oil surveyors kidnapped and taken to his palace in Mongolia, where they are forced to identify drilling locations on unmarked maps.  Borjin's plan is to disrupt the world's oil supply by using a machine that generates earthquakes and to take over hidden oil reserves in the former Inner Mongolia by forcing China to cede the former Inner Mongolia back to Mongolia in exchange for Borjin's agreement to supply China all of its oil needs at market price.  Borjin has funded his plan by selling artifacts from Genghis Khan's tomb, which he found and keeps secretly at his palace.

Pitt and Giordano go on a mission to save the oil surveyors, and, after several near-death scrapes and finding the cheetah skin, ultimately rescue the oil surveyors by using the earthquake machine at Borjin's palace.  With the palace crumbling, Pitt saves Genghis Khan's tomb from destruction, while Borjin is killed.  In the meantime, Pitt's fraternal twin children find an eleventh century Chinese junk while surveying the reef off of the Big Island.  Pitt realizes that the

cheetah skin he found provides a map of Hawaii, and he joins his children to find Kublai Khan's tomb and treasure in a hidden lava tube.

ii.   *Trojan Odyssey*

In *Trojan Odyssey*, written by Clive Cussler in 2003, Pitt and Giordano save the world again when they stop the Odyssey corporation, run by a mysterious man named Specter, from diverting the South Equatorial Current through underground tunnels and causing a drop in the Gulf Stream temperature that would force North America and Europe into a frigid winter.

*Trojan Odyssey* begins in 1190 B.C., providing a new version of the Trojan War (the Trojan horse is a battling ram) and reciting some of Odysseus' travels in the Odyssey, specifically his ship getting destroyed by Laestrygonians and his encounters with Circe and Calypso.  In the present time, a hurricane bears down in the Caribbean, threatening both a floating hotel owned by Odyssey and Pitt's children who are working in an underwater station.  Through extraordinary efforts, Pitt and Giordano save both.

Pitt and Giordano are next sent to Nicaragua to investigate "brown crud" that is polluting the area's waters.  They uncover that the brown crud is waste generated from Odyssey building underground canals, and also find a compound of scientists being held hostage who have created a clean energy fuel

cell which Odyssey plans to sell once North America and Europe are plunged into winter.  Pitt and Giordano save the scientists, and the United States destroys the tunnels by collapsing part of an old volcano.

In the meantime, Pitt's children find the tomb of Circe.  While looking for treasure from Odysseus' sunken fleet, they are kidnapped by a coven of beautiful women connected to Odyssey.  Pitt and Giordano save the children before the coven can perform their ritual sacrifice and Pitt exposes that Specter is actually the head of this coven in disguise.

iii.    *Lost City*

In *Lost City*, written by Clive Cussler with Paul Kemprecos in 2004, Austin and Zavala uncover and foil a plot by an old arms family seeking immortality and world domination.

In the prologue, Jules Fauchard's plane is shot down as he tries to escape his family and provide the world information that would stop World War I. In the present time, Austin is working in the French Alps with the beautiful Sky La Belle, who is trying to find evidence of ancient trade routes submerged in a lake. La Belle's research is cut short when she is summoned to a subglacial observatory to investigate a man frozen in the glacier.  Goons flood the tunnel -- trapping La Belle, scientists, and others -- but Austin and Zavala save the day.

10

After figuring out that the frozen man is Jules Fauchard, Austin and La Belle visit the very private Racine Fauchard, who unsuccessfully tries to kill them during a costume party.  Austin's focus is then diverted when two of his NUMA colleagues are kidnapped while they were investigating gorgonweed, an invasive algae growing in the Lost City (a deep-sea hydrothermal vent field). Austin and Zavala rescue their NUMA colleagues from an island research facility where they were forced to help develop the elixir of life for Racine Fauchard. Austin ultimately confronts Racine, who reveals her plan to become immortal and dominate the world by saving it from the gorgonweed she created.  In the end, Racine is killed when her elixir backfires and NUMA figures out how to kill the gorgonweed.

iv.    *The Navigator*

In *The Navigator*, written by Clive Cussler with Paul Kemprecos in 2007, Kurt Austin and Joe Zavala track down the Lost Ark of the Covenant and defeat the villainous Victor Balthazar, who is bent on finding and using the Ark to spur international conflict and gain a monopoly in the mercenary business.

The prologue starts in 900 B.C., where a Phoenician boat lands in what we later learn to be the Chesapeake Bay and one of King Solomon's sons hides the Ark.  In 1809, Thomas Jefferson is given a vellum, which we later learn

provides a map to the Ark.  In the present, while observing how to wrangle icebergs away from oil and gas rigs, Austin and Zavala divert their attention to preventing a runaway boat from colliding with an oil rig.  The boat was carrying the beautiful Professor Carina Mechadi and artifacts she recovered from the looted Iraqi National Museum, including the "Navigator," a bronze statue, which, we learn later, has a map to the Lost Ark.  Goons had disabled the crew to steal the Navigator, but Austin and Zavala foil their plan.

Mechadi is funded by Balthazar, who Mechadi and Austin learn is behind the efforts to steal the Navigator.  *The Navigator* includes a series of action-packed scenes -- including, for example, Balthazar stealing the Navigator, Austin and Mechadi finding a second Navigator and evading Balthazar's goons, Austin and Zavala finding the Phoenician ship sunken in the Chesapeake Bay, and Austin jousting Balthazar for Mechadi and saving her from a vat of Balthazar's sacrificial oil.  After Balthazar is killed, the NUMA team follow the map to the Lost Ark, only to find that Thomas Jefferson had taken it for safekeeping.

v.    *Golden Buddha*

*Golden Buddha*, written by Clive Cussler and Craig Dirgo in 2003, is in a similar vein to Mission Impossible and Ocean's 11 because it describes well-orchestrated multi-character heists that are carried off using a milleau of disguises

12

and technology.  In *Golden Buddha*, Juan Cabrillo and his "Corporation" of mercenaries restore the Dalai Lama to Tibet.  To this end, the team first implements an elaborate scheme to steal a six-foot golden Buddha, which secretly holds a parchment describing oil reserves in Tibet.  The team then neutralizes the Chinese forces threatening to invade Tibet, destroys nerve gas hidden in the Dalai Lama's temple, and ensures enough United Nations votes to have Tibet recognized.

**B.     Procedural Background**

On June 12, 2008, Plaintiff filed his Complaint alleging a federal claim for copyright infringement and state law claims for conversion, unfair and deceptive trade practices, and breach of implied contract.

On May 6, 2009, Defendants filed their Motion for Summary Judgment.  On June 4, 2009, Plaintiff filed an Opposition, arguing, among other things, that he needed additional time to perform discovery on Defendants' access to *Gold of the Khan*.  On June 9, 2009, the court granted Plaintiff's request for additional time.  On September 18, 2009, Plaintiff submitted a Supplemental

///

///

///

///

13

Opposition, and Defendants filed a Reply on October 2, 2009.[3]  A hearing was held on November 9, 2009.

### III.  <u>STANDARD OF REVIEW</u>

Summary judgment is proper where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Rule 56(c) mandates summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Broussard v. Univ. of Cal. at Berkeley*, 192 F.3d 1252, 1258 (9th Cir. 1999).

"A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007) (citing *Celotex*, 477 U.S. at 323); *see also Jespersen v. Harrah's*

---

[3]  As an exhibit to their Reply, Defendants attach the expert report of Steven Taylor Goldsberry, M.F.A., Ph.D.  *See* Defs.' Ex. NN.  Plaintiff asks that the court strike this expert report because it is untimely and is an inadmissible unsworn expert statement.  *See* Doc. No. 79. The court need not decide Plaintiff's Motion to Strike, however, because the court does not rely on Defendant's expert report to make the summary judgment determination.  While expert reports can oftentimes be helpful in applying the extrinsic test, *see Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000), as explained below, the works at issue in this action are so dissimilar that the court can apply the extrinsic test without the aid of an expert report.

*Operating Co.*, 392 F.3d 1076, 1079 (9th Cir. 2004). "When the moving party has carried its burden under Rule 56(c) its opponent must do more than simply show that there is some metaphysical doubt as to the material facts [and] come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586-87 (1986) (citation and internal quotation signals omitted); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986) (stating that a party cannot "rest upon the mere allegations or denials of his pleading" in opposing summary judgment).

"An issue is 'genuine' only if there is a sufficient evidentiary basis on which a reasonable fact finder could find for the nonmoving party, and a dispute is 'material' only if it could affect the outcome of the suit under the governing law." *In re Barboza*, 545 F.3d 702, 707 (9th Cir. 2008) (citing *Anderson*, 477 U.S. at 248). When considering the evidence on a motion for summary judgment, the court must draw all reasonable inferences on behalf of the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *see also Posey v. Lake Pend Oreille Sch. Dist. No. 84*, 546 F.3d 1121, 1126 (9th Cir. 2008) (stating that "the evidence of [the nonmovant] is to be believed, and all justifiable inferences are to be drawn in his favor." (citations omitted)).

15

# IV. **DISCUSSION**

Defendants seek summary judgment on all of Plaintiff's claims, which include copyright infringement, conversion, unfair and deceptive trade practices, and breach of implied contract. The court addresses each claim in turn.

## A. **Copyright Infringement**

Defendants argue that they are entitled to summary judgment on Plaintiff's copyright infringement claim because the Cussler Books and Plaintiff's *Gold of the Khan* are not substantially similar in their protected elements. While Plaintiff conceded during the November 9, 2009 hearing that there are not enough similarities between *Gold of the Khan* when compared to *Trojan Odyssey*, *Lost City*, *The Navigator*, or *Golden Buddha* by themselves, Plaintiff asserts that the court must compare *Gold of the Khan* with all of the Cussler Books as a whole, and in any event, there are sufficient similarities between *Gold of the Khan* and *Treasure of Khan* to create a fact question for the jury. Based on the following, the court finds that Defendants are entitled to summary judgment on this claim.

### 1. *Framework*

"To establish infringement, two elements must be proven: (1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original." *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340,

361 (1991) (citation omitted).  Because Plaintiff's ownership in the copyright is

undisputed, at issue is whether there is a triable issue of fact that Defendants

"cop[ied] anything that was 'original' to" Plaintiff's *Gold of the Khan*.  *Funky*

*Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1076 (9th Cir. 2006)

(quoting *Feist Publ'ns, Inc.*, 499 U.S. at 361).

　　　　Whether Defendants copied Plaintiff's work "may be established by

showing that the works in question 'are substantially similar in their protected

elements' and that the infringing party 'had access' to the copyrighted work."  *Rice*

*v. Fox Broad. Co.*, 330 F.3d 1170, 1174 (9th Cir. 2003) (quoting *Metcalf v.*

*Bochco*, 294 F.3d 1069, 1072 (9th Cir. 2002)).  While summary judgment is not

"highly favored" for this inquiry, it can nonetheless be decided as a matter of law

and is "appropriate if no reasonable juror could find substantial similarity of ideas

and expression."  *Funky Films, Inc.*, 462 F.3d at 1076-77 (citation and quotation

signals omitted).

　　　　A two-part test applies to determining whether two works are

substantially similar -- an extrinsic test and intrinsic test.  *Rice*, 330 F.3d at 1174

(citing *Kouf v. Walt Disney Pictures & Television*, 16 F.3d 1042, 1045 (9th Cir.

1994).  On summary judgment, only the extrinsic test is relevant, as the intrinsic

test "examines an ordinary person's subjective impressions of the similarities

between two works [and] is exclusively the province of the jury." *Funky Films, Inc.*, 462 F.3d at 1077.  In comparison, the extrinsic test is objective and focuses on "'articulable similarities between the plot, themes, dialogue, mood, setting, pace, characters, and sequence of events' in the two works." *Id.* (quoting *Kouf*, 16 F.3d at 1045).  The court must compare the "actual concrete elements that make up the total sequence of events and the relationships between the major characters." *Id.* (quotation signals omitted).

"In applying the extrinsic test, [the court] must distinguish between the protectable and unprotectable material because a party claiming infringement may place 'no reliance upon any similarity in expression resulting from unprotectable elements.'" *Rice*, 330 F.3d at 1174 (quoting *Apple Computer, Inc. v. Microsoft Corp.*, 35 F.3d 1435, 1446 (9th Cir. 1994)).  Only the expression of ideas receives protection, not the ideas themselves because "otherwise, the first to come up with an idea will corner the market." *Apple Computer, Inc.*, 35 F.3d at 1443; *see also Metcalf*, 294 F.3d at 1074 ("[P]rotectable expression includes the specific details of an author's rendering of ideas.").  The court must therefore "filter out and disregard the non-protectable elements in making [the] substantial similarity determination" and "inquire only whether the *protectable elements,*

*standing alone*, are substantially similar." *Funky Films, Inc.*, 462 F.3d at 1077 (quotations omitted).

### 2.    *Application*

As an initial matter, Plaintiff argues that the court must assess substantial similarity not merely between *Gold of the Khan* and each Cussler Book separately, but between *Gold of the Khan* and the Cussler Books collectively. Plaintiff cites absolutely no legal support for this argument and indeed, it runs wholly counter to the extrinsic test, which focuses on the "actual concrete elements that make up the *total* sequence of events and the relationships between the major characters." *Funky Films, Inc.*, 462 F.3d at 1077 (emphasis added).  Pulling out disparate aspects across multiple works would disembowel this analysis and result in a list of random similarities, which the Ninth Circuit has rejected.  *See Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984).

If the court accepted Plaintiff's proposition, then copyright infringement could be established based on isolated similarities between *Gold of the Khan* and all of the Cussler Books, even though each Cussler Book does not share substantial similarities with *Gold of the Khan*.  For example, Plaintiff could try to meet the extrinsic test for *Gold of the Khan* by pointing to similarities with plot elements in *Treasure of the Khan*, character traits in *Lost City*, settings in

19

*Golden Buddha*, themes in *Trojan Odyssey*, dialog in *The Navigator*, and so on.

Alternatively, Plaintiff could attempt to pool together different parts of the Cussler

Books to meet each of the extrinsic test's eight inquiries.  For example, Plaintiff

could attempt to prove character similarities with *Gold of the Khan's* Marya

Bradwell by pointing to *The Navigator's* Carina Mechadi, who has a passion for

protecting antiquities, *Lost City's* Sky La Belle, who is also a university professor,

and *Treasure of Khan's* Summer Pitt, who is confident and attractive.  To accept

Plaintiff's proposition would mean that "hardly any drama since the Garden of

Eden could survive the charge of plagiarism."  *Rose v. Connelly*, 38 F. Supp. 54,

55-56 (S.D.N.Y. 1941).  Such result is simply untenable.

The court therefore rejects Plaintiff's argument that the court must

compare *Gold of the Khan* with the Cussler Books as a whole.  Further, because

Plaintiff concedes that *Gold of the Khan* and each of the Cussler Books other than

*Treasure of Khan* do not have enough similarities to support a copyright

infringement claim on their own, the court compares the individual features of

*Gold of the Khan* and *Treasure of Khan* for specific similarities between plot,

theme, dialog, mood, setting, pace, characters, and sequence of events.

///

///

20

a.   _Gold of the Khan_ and _Treasure of Khan_

i.   Plot

_Gold of the Khan_ and _Treasure of Khan_ involve vastly different plots. In _Gold of the Khan_, Bradwell, a female history professor, follows clues in Marco Polo's previously undiscovered journal to find his lost treasure and the Tablets of Command hidden in a church in Korcula.  Along the way, she is pursued by goons who want the Tablets of Command for a Mongolian drug lord, is kidnapped and rescued from a palace in Kashgar, becomes a media sensation, and falls in love.  In comparison, in _Treasure of Khan_, Pitt and his sidekick Giordano foil a plot by an evil Mongolian oil tycoon to disrupt the world's oil supply with the use of a machine that generates earthquakes.  Along the way, they save oil surveyors from a seiche wave, rescue the oil surveyors from certain death after they are kidnapped and brought to a Mongolian palace, and find both Genghis Khan's and Kublai Kahn's tombs.

The closest plot similarity is that in both works characters are kidnapped, driven over rough terrain for several hours and past a sizeable city to a mansion, and held by a wealthy Mongolian villain who attempts to force his captives to help him.  This loose similarity is merely a general idea and not a form "of literary expression protected against copying."  _Berkic v. Crichton_, 761 F.2d

1289, 1293 (9th Cir. 1985).  Indeed, this general idea is expressed very differently in each work -- in *Gold of the Khan*, Bradwell is kidnapped by a Mongolian drug lord bent on having the Tablets of Command and threatens Bradwell to help him, while in *Treasure of Khan*, oil surveyors are kidnapped by a Mongolian oil tycoon and forced to identify underground oil reserves.

Beyond the fact that both works include kidnappings, Plaintiff has amassed a list of what he believes are 83 plot "similarities" between the two works. *See* Pl.'s Revised Ex. 12.[4]  Given the very divergent subject matters of the works at issue, Plaintiff's Revised Exhibit 12 points out only very minor similarities between the works that qualify either as scenes a faire or minute details and words that are not subject to copyright protection.  Lists such as the one presented by Plaintiff are "inherently subjective and unreliable" and the court must be "particularly cautious where, as here, the list emphasizes random similarities scattered throughout the works."  *Litchfield*, 736 F.2d at 1356; *see also Williams v.*

---

[4]  In addition to Plaintiff's Revised Exhibit 12, which organizes Plaintiff's alleged similarities by features the court must analyze (plot, characters, theme, etc.), Plaintiff provides two additional exhibits listing similarities he perceives between *Gold of the Khan* and the Cussler Books.  The court finds Plaintiff's Revised Exhibits 10 and 11 completely unhelpful because they do not specifically address the eight factors the court must consider and it is unclear whether Plaintiff believes each of the alleged similarities outlined in these exhibits are actually similarities of protected elements.  Further, at best, Plaintiff's Revised Exhibits 10 and 11 catalog random similarities scattered across the works at issue, which the Ninth Circuit has rejected.  *See Litchfield v. Spielberg*, 736 F.2d 1352, 1356 (9th Cir. 1984).

*Crichton*, 84 F.3d 581, 590 (2d Cir. 1996) ("Such a scattershot approach [of pointing to specific instances of similarity] cannot support a finding of substantial similarity because it fails to address the underlying issue: whether a lay observer would consider the works as a whole substantially similar to one another.").

Looking at the substance of Plaintiff's asserted similarities, none of them identifies a substantial similarity of a protected element.  For example, Plaintiff asserts that several scenes are similar between the two works.  In describing characters uncovering important artifacts, both works describe that the individual kneels on dusty ground with their hands trembling, uncovers the item gingerly, and then contemplates the meaning of their discovery.  Pl.'s Revised Ex. 12, at 4-5.  In another scene, both works describe that while the female character is being held by the villain, she is by herself, held for a couple of days, wonders whether her colleagues and/or friends are alive, and is served food on a tray.  *Id.* at 14-15.  Finally, in describing the unveiling of the treasure that the main character finds, both works describe that the main characters, dignitaries, media, and crowds of people are in attendance, the treasure is on display, and the hero is thanked for making the discovery.[5]  *Id.* at 29-30.  These similarities do not stand up to scrutiny

---

[5]  Plaintiff also suggests that the final fight scenes in both works are similar because they occur on domed structures that are weakened by earthquakes.  *See* Pl.'s Revised Ex. 12, at 26-27.  Beyond these vagaries, the two scenes are not similar at all.  In *Gold of the Khan*, Bradwell and

(continued...)

for copyright protection -- "'scenes a faire,' or scenes that flow naturally from

unprotectable basic plot premises" such as these are not protected by copyright

law. *Metcalf*, 294 F.3d at 1074 (citation and internal quotation marks omitted).  As

*Berkic* commented, "[t]he common use of such stock cannot raise a triable issue of

fact on the plaintiff's copyright claim.  It merely reminds us that in Hollywood, as

in the life of men generally, there is only rarely anything new under the sun."

*Berkic*, 761 F.2d at 1294.

Plaintiff also points out numerous small insignificant details found in

both works, such as: tough Asian goons attempt to kidnap female characters; a

character drinks a cup of tea, in one work to calm nerves, and in the other to focus;

an assailant is hit in the head with an object; characters suffer gunshot wounds to

the right calf; a female character seeks to avoid capture by diving into a body of

water; and the protagonist shows up at a hotel in a "bedraggled state."  *See*

*generally* Pl.'s Ex. 12.  These similarities appear to be at most coincidences in

minute non-protected details that the court cannot consider in its analysis.  *See*

_____

[5](...continued)
Di Angelo are confronted on the belltower of St. Mark's church by Argawal.  The belltower is
domed and has cracks in it from an earthquake that occurred years ago.  Argawal plummets to
his death after trying to reach the cross, which holds the Tablets of Command.  In comparison,
after one of Pitt's colleagues creates an earthquake at Borjin's compound, Borgin goes to the
domed mausoleum where he keeps Genghis Khan's tomb.  Pitt confronts Borgin, who is
eventually killed when part of the mausoleum crashes on top of him.

*Funky Films, Inc.*, 462 F.3d at 1077 (requiring the court to filter out non-protectable elements from the analysis).  In sum, the plots of the two works share no substantial similarities.

        ii.      Characters

There are few parallels between the characters in *Gold of the Khan* and *Treasure of Khan*.  In *Gold of the Khan*, the main character, Bradwell, is a professor at a Massachusetts university who gets thrown into her first real adventure when she tries to find the Tablets of Command.  She is driven by the memories of her family and holds tight to her morals and speaks her mind at every turn.  She meets and falls in love with Di Angelo, an Irish-Italian antiquities dealer who over the course of the story learns to appreciate Marya's point of view and puts himself in danger to help her.  Bradwell and Di Angelo receive help from the Bellardo family, who sells antiquities raided from tombs and who, like Di Angelo, are won over by Bradwell's point of view on preserving history.

There are no characters similar to Bradwell, Di Angelo, and the Bellardos in *Treasure of Khan*.  In *Treasure of Khan*, Pitt and Giordano are rugged scientists who are no strangers to danger and who think on their feet and confront any evil that stands in their way.  Pitt's children Summer and Dirk are cut from the

same cloth as their father and use their smarts and gumption to foil evil-doers.[6]

The oil surveyors are less developed as characters, but never lose hope of escaping

the Mongolian villain even after one of them is killed.

　　　　The only characters between the two works that have some

similarities are the Mongolian villains.  In both works, the villain believes he is a

descendant of Genghis Khan, has collected antiquities from the Mongolian empire,

and lives in a lavish mansion.  These similarities on their own are too general to

support a finding of substantial similarity and indeed, many fictional works include

villains who believe they are descendants of Genghis Khan.  *See* Defs.' Exs. V-LL.

Beyond these general similarities of the two villains, the court also recognizes that

both characters are also motivated at least in part to reunite portions of China with

Mongolia and gain oil reserves.  This common motivation, however, is expressed

very differently between the two works.  In *Gold of the Khan*, the "Khan," dressed

in clothing reminiscent of Genghis Khan, seeks to reunite the entire Mongol

empire, apparently as part of his delusion that he is quite literally the Khan.  He is a

military trained opium drug lord who gathered his own military force and has

coordinated raids, car bombings, assassinations, and kidnappings in Asian capitals.

---

[6] Plaintiff summarily argues that Bradwell and Dirk's daughter have strong similarities, *see* Pl.'s Opp'n 21, but the court disagrees.  While both characters are strong, attractive women who think for themselves, these are general stock character traits and the similarities between these characters end there.

The fact that some of the land he hopes to reunite with Mongolia has oil reserves is mentioned only as an aside.  In comparison, in *Treasure of Khan*, the villain, Borjin, is a businessman -- he is president of Avarga oil company, dresses in suits, and carries on meetings with the Chinese government.  His entire focus is to take over oil reserves hidden in China by unifying Inner and Outer Mongolia and he is funded through his sale of antiquities from Genghis Khan's tomb, which he keeps secretly at his mansion.  He is  carrying out his scheme by disrupting the world's oil supply with a machine that generates earthquakes.

In opposition, Plaintiff again points to his list in Plaintiff's Revised Exhibit 12, but this voluminous list does nothing more than outline similar random details that do not actually address the proper analysis -- *i.e.*, whether the characters themselves are similar.  Instead, the list again recites random details -- for example, that both Di Angelo and Pitt decide to rescue the kidnap victim(s) rather than return to the United States, play a role in rescuing the victims, and have a "mantra" that plays repeatedly in their heads.  Pl.'s Revised Ex. 12 at 41-44.  As another example, Plaintiff suggests that the Bellardo sons are similar to Pitt and Giordano because both sets of characters squeeze into disguises, and both Ambrosio and Giordano hit two opponents together to make a "sickening" noise. *Id.* at 55.  As described above, Plaintiff's random lists are unhelpful and merely list

scenes a fair, general plot ideas, and minute details that cannot be the basis of a copyright infringement claim.

### iii.    Theme

Broadly cast, the main theme of both works appears to be perseverance over insurmountable odds.  Such a general theme however, is not protectable.  *See*, *e.g.*, *Olson v. Nat'l Broad. Co.*, 855 F.2d 1446, 1451 (9th Cir. 1988) (finding that while the two works "emphasize action," such similarity is "common to the genre of action-adventure television series" and not protectable). Beyond this general theme, smaller themes in *Gold of the Khan* include unification of the East and the West, preservation and respect for antiquities and history, and learning to trust and love despite differences in background.  In comparison, *Treasure of Khan* does not have any discernable character or plot development that would highlight any particular theme and in any event, none of the themes found in *Gold of the Khan* is apparent in *Treasure of Khan*.

Plaintiff asserts that a common theme between the works is "separatist movements among minority people in China."[7]  Pl.'s Ex. 12 at 72-73.  To the extent

---

[7]  Beyond this "theme," Plaintiff asserts that both works include "shady antiquities dealers" because Bellardo in *Gold of the Khan* sells treasure looted from ancient tombs, and the villain in *Treasure of Khan* has financed himself by selling artifacts from Genghis Khan's tomb through the Buryat Trading Company.  Pl.'s Revised Ex. 12 at 73-74.  As an initial matter, "shady antiquities dealers" is not a theme and perhaps at most a plot detail.  Further, this

(continued...)

this is a theme, as opposed to a motif or subject, such "theme" is used and expressed differently in the works at issue.  For example, in *Gold of the Khan*, the villain has connections with separatist groups in the Xinjiang province, Mongolia, and Tibet, and could potentially incite an insurrection against China and reunite Tibet, Mongolia, and the Central Asian Republics.  Pl.'s Ex. B at 108-09, 116-17. In comparison, in *Treasure of Khan*, Pitt and Giordano receive the help of a family of camel herders in Mongolia and the father explains that his family was forced out of Chinese Inner Mongolia due to China's commandeering of land.  Defs.' Ex. D, at 352-54.  Given that the expression of the general subject of "separatist movements among minority people in China" differs between the two works -- serving as a motivation for the villain in *Gold of the Khan* versus a mere commentary in *Treasure of Khan* -- this subject does not support an inference of substantial similarity.  *See*, *e.g.*, *Funky Films, Inc.*, 462 F.3d at 1079-80 (discussing that while both works at issue explore the same themes, "they do so in very different ways").

///

///

----

[7](...continued)
generalism is not any type of similarity that supports a finding of substantial similarity.

29

iv.    Setting

Given their adventure settings, both works have a number of international settings, but with very little overlap.  The settings in *Gold of the Khan* include: a university in Massachusetts; a plane flying from Boston to Venice; a hotel, the canals, a convent, and the Bellardo's house in Venice; street markets and a hotel in Dushanbe; the villain's mansion outside of Kashgar; the Dalmatian coast; and churches, the streets, and a home in Korcula.  In contrast, the settings in *Treasure of Khan* include: a naval battle off of Japan in 1291; various boats on Lake Bakail; a mansion, an industrial site, the desert, nomadic towns, and a Buddhist temple in Mongolia; and the reef, a research vessel, a sunken junk, and a lava tube near the Big Island.

The only setting between both works that has any similarity whatsoever is the villain's mansion, which is filled with Mongolian antiquities and set in the desert with mountains nearby.  This similarity in a single location, however, merely flows from the stock character of a wealthy and powerful Mongolian villain and does not support a finding of substantial similarity between the two works.  *See Berkic*, 791 F.2d at 1293 (observing that no protection may be afforded to "situations and incidents which flow naturally from a basic plot premise").

30

In opposition, Plaintiff asserts without any support whatsoever that this inquiry requires the court to look at details such as the designs of buildings, clothing and costumes, food, aromas and odors, sounds, and art objects. Pl.'s Revised Ex. 12 at 61. The court agrees that if two works have many of the same details in describing a setting, then these details could support a finding of similarity under certain circumstances. Plaintiff's "similarities," however, are nothing more than random details smattered throughout scenes and settings that could appear in any novel. For example, Plaintiff points out that both works include details such wooden doors, pendulum clocks, life-sized figures of warriors, gold and silver artifacts, and doric columns. *Id.* at 63-65, 67. Plaintiff's focus on these minute details does not obscure the fact that the overall settings and how the settings fit within the story as a whole are vastly dissimilar.

v.    Dialog

The dialog in *Gold of the Khan* is pedestrian, straight conversation/exposition. In contrast, *Treasure of Khan*, like the other Cussler Books, involves witty dialog, with the characters managing to crack jokes in the face of every tense situation. Any similarity of dialog -- as pointed out by Plaintiff to include that characters in both works make a comment about "candid camera" when seeing a surveillance video, refer to a stranger as "sideburns," say "Nooooo,"

and in response to an offer for help say either "I'll take over from here," or "We'll take the risk from here," *id.* at 6, 21, 22, 42 -- is found only in random words and a function of the genre of these books and the fact that the English language has only so many words. *See Grosso v. Miramax Film Corp.*, 383 F.3d 965, 967 (9th Cir. 2004) (finding that the "the only similarities in dialogue between the two works come from the use of common, unprotectable poker jargon"); *Kouf*, 16 F.3d at 1046 (affirming that the district court properly found that dialog in the two works were dissimilar as a matter of law because they "are similar in random words, at best").

### vi.    Sequence of events

Given the very different plots of these two works, the two stories do not share any detailed sequence of events.

### vii.    Mood and pace

The mood and pace between the works also differ dramatically. *Treasure of Khan* provides back-to-back action sequences, with at least one character in danger in almost every scene. These back-to-back action sequences create suspense, building tension throughout the novel. In contrast, *Gold of the Khan's* few action sequences are broken up with recitations of the history of Marco Polo, budding romance, and long conversations developing the characters. While

32

*Gold of the Khan* may evoke a similar mood and pace as *Treasure of Khan* in certain action scenes, such similarities are common to the action adventure genre and do not demonstrate substantial similarity.  *See Olson*, 855 F.2d at 1451 (stating that the similarities between "The A-Team" and "Cargo" of emphasizing action and providing comedy "are common to the genre of action-adventure television series and movies and therefore do not demonstrate substantial similarity").

      b.    <u>*Gold of the Khan* and the other Cussler Books</u>

The Complaint acknowledges that the similarities between *Gold of the Khan* and the other Cussler Books "may not rise to the level of substantial similarity necessary to constitute infringement," Compl. ¶ 25, and at the November 9, 2009 hearing, Plaintiff conceded that the there are not enough similarites between *Gold of the Khan* and *Trojan Odyssey*, *Golden Buddha*, *Lost City*, or *The Navigator* to support a copyright infringement claim.  Indeed, the remaining Cussler Books are even more different than *Gold of the Khan*.  Like *Treasure of Khan*, the remaining Cussler Books all involve fast-paced, high action-adventure, where the protagonist saves the day while maintaining his cool.  The court can find absolutely no substantial similarities between protected elements of *Gold of the Khan* and these books.  While Plaintiff again points to loose similarities of general plot elements, stock characters, and minute, random details of the same ilk

discussed above for *Treasure of Khan*, these coincidences between the works are nothing more than that -- coincidences of similarities that exist amongst almost any work of this genre.[8]

c.    *Plaintiff's remaining arguments against summary judgment*

Based upon its review of the relevant elements, the court finds that there is no substantial similarity between *Gold of the Khan* and any of the Cussler Books.  Plaintiff nonetheless raises a number of arguments suggesting that even though there are no substantial similarities between protected elements of these works, summary judgment is still inappropriate.  The court addresses each of Plaintiff's arguments.

First, Plaintiff suggests that the court should consider the fact that the titles of *Gold of the Khan* and *Treasure of Khan* are "nearly identical."  Pl.'s Opp'n 19.  In finding that there was a jury question precluding summary judgment, *Shaw v. Lindheim*, 919 F.2d 1353, 1362 (9th Cir. 1990), weighed the fact that both works

---

[8] Defendants argue that (1) the court should not consider *Lost City* because Plaintiff did not identify it in the Complaint, and (2) there is no genuine issue of material fact that *Golden Buddha* uses any protected elements from *Gold of the Khan* because it was written before Plaintiff sent his manuscript to Penguin for consideration.  The court agrees that Plaintiff has not provided Defendants sufficient notice that he believes *Lost City* infringes Plaintiff's *Gold of the Khan*, but even if the court does consider *Lost City*, there are no substantial similarities that would pass the extrinsic test.  Regarding *Golden Buddha*, the court finds that there is a genuine issue of material fact whether it was completely finished before Plaintiff sent his manuscript. *See* Pl.'s Ex. 14 (stating that Clive Cussler is still doing some "last-minute editing" on *Golden Buddha* in the spring of 2003).  The court's comparison of *Golden Buddha* with *Gold of the Khan*, however, reveals no similarities between protected elements.

at issue had the same title "The Equalizer."  Applied here, however, *Gold of the Khan* and *Treasure of Khan* do not have the same title, and using the word "Khan" in the title is hardly indicative of copying where both works involve finding treasure of Kublai Khan and/or Genghis Khan.  *See also Phillips v. Murdock*, 543 F. Supp. 2d 1219, 1225-26 (D. Haw. 2008) (finding that where the works at issue were titled "Wisdom Bible of God" and "Wisdom Bible," "a similarity of titles is not a significant enough factor to find a substantial similarity").

Second, Plaintiff argues that even though the similarities between the works are not themselves unusual or unique, the cumulative weight of the similarities is sufficient to raise a fact question for the jury as found in *Shaw* and *Metcalf*.  Pl.'s Opp'n 15-18.  Plaintiff's reliance on *Shaw v. Lindheim*, 919 F.2d 1353 (9th Cir. 1990), and *Metcalf v. Bochco*, 294 F.3d 1069 (9th Cir. 2002), is misplaced.  In both *Shaw* and *Metcalf*, the works at issue shared a general plot and sequence of events.  *Shaw*, 919 F.2d at 1363; *Metcalf*, 294 F.3d at 1074.  *Shaw* explained that "[w]here plot is . . . properly defined as 'the "sequence of events" by which the author expresses his "theme" or "idea,"' it constitutes a pattern which is sufficiently concrete so as to warrant a finding of substantial similarity if it is common to both plaintiff's and defendant's works."  *Shaw*, 919 F.2d at 1363 (quoting Nimmer on Copyright § 1303[A], at 13-31).  Even though none of the

plot elements at issue in *Shaw* and *Metcalf* was particularly unique by themselves, the common sequencing of these elements was sufficient to satisfy the extrinsic test. *See id.* ("Even if none of these plot elements is remarkably unusual in and of itself, the fact that both scripts contain all of these similar events gives rise to a triable question of substantial similarity of protected expression."); *Metcalf*, 294 F.3d at 1074 ("The particular sequence in which an author strings a significant number of unprotectable elements can itself be a protectable element.").

Unlike *Shaw* and *Metcalf*,[9] Plaintiff's list of similarities cannot hide the fact that there is no common pattern in the expression of non-unique plot elements; rather, Plaintiff merely relies on random phrases throughout the works and vague parallels between single scenes.[10]  Indeed, unlike *Shaw* and *Metcalf*

---

[9]  For example, in *Metcalf v. Bochco*, 294 F.3d 1069, 1073-74 (9th Cir. 2002), the similarities were striking, and include, for example, that both works (1) are set in overburdened county hospitals in inner-city Los Angeles with mostly black staffs; (2) deal with issues of poverty, race relations and urban blight; (3) have main characters that are young, good-looking, muscular black surgeons who grew up in the neighborhood where the hospital is located and who  struggle to choose between private practice and working in the inner city and who develop relationships with hospital administrators despite already being romantically involved with young professional women; and (4) include that the administrator is in her thirties, was once married but is now single, is without children, and is devoted to her career.

[10]  Plaintiff further suggests that copyright infringement may be based on the copying of even a relatively small portion of the work at issue and that Defendants may not defend a copyright claim by simply pointing out the differences between the works.  Pl.'s Opp'n 13-15. While the court agrees with this statement in theory, it does not apply to this case where the works at issue are completely different and the only similarities Plaintiff can allude to are general plot ideas that are expressed in completely different manners, tenuous scene similarities, stock character sketches, and random words scattered through the works.

where the works at issue strung together generic scenes and stock characters to tell similar plots and express similar themes, the two works at issue in this action have completely different plots, sequences of events, and themes.  Unlike *Metcalf*, a jury could not interpret that any similarities between *Gold of the Khan* and *Treasure of Khan* "were the result of copying, not mere coincidence."  *Id.* at 1075.

Finally, Plaintiff argues that he is entitled to application of the inverse ratio rule.  The inverse ratio rule provides that where a defendant had a high degree of access to the plaintiff's work, "'a lower standard of proof of substantial similarity'" is required.  *Rice*, 330 F.3d at 1178 (quoting *Three Boys Music Corp. v. Bolton*, 212 F.3d 477, 485 (9th Cir. 2000)).  Plaintiff suggests that Defendants had a high degree of access to *Gold of the Khan* because (1) Rose Hilliard, an editorial assistant at Penguin, received two paper copy versions and a CD of *Gold of the Khan* and read them; (2) Plaintiff's manuscript could have been sent to any division in Penguin because the manuscript was not safeguarded and the CD is unaccounted for; (3) the division of Penguin that Plaintiff sent his manuscript to is on the same floor as the division of Penguin that published the Cussler Books and the two groups interact; and (4) Defendants had motive to copy Plaintiff's manuscript due to the financial gain they receive from the Cussler Books.  Pl.'s Suppl. Opp'n 7-12.

Viewing the evidence in a light most favorable to Plaintiff, these facts do not support that Defendants had a *high* degree of access to *Gold of the Khan.* Claims of access cannot be based on inference and speculation, and courts have generally applied the inverse ratio rule where the defendant has conceded access. *See Rice*, 330 F.3d at 1178-79.  To show a high degree of access, a plaintiff must present "significant, affirmative and probative evidence."  *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 51-52 (2d Cir. 2003).  At most, the evidence establishes that Hilliard, an assistant in a separate division than the one that publishes the Cussler Books, read *Gold of the Khan*, asked some of her colleagues to read it, and spoke to them about the general concept.  *See* Pl.'s Ex. 9 (stating that she requested a few reads when the manuscript first came in); Pl.'s Ex. 19, at 35-36 (explaining that she polled her co-workers to see if they believed Marco Polo would have wide appeal). There is no evidence -- direct or circumstantial -- that any of the authors or editors of the Cussler Books had access to *Gold of the Khan*.  Accordingly, the court finds that Plaintiffs have failed to establish a genuine issue of material fact that they are entitled to the inverse ratio test.  Further, even if the court did apply the inverse ratio test, summary judgment would still be appropriate because even under this lower standard of proof, the similarities between the works at issue are simply too tenuous to support any finding of substantial similarity.

The court therefore GRANTS Defendant's Motion for Summary

Judgment on Plaintiff's copyright infringement claim.

**B.      Plaintiff's State Law Claims**

Defendants argue that Plaintiff's state law claims are preempted by

federal copyright law, and to the extent they are not preempted, that they are

entitled to summary judgment.  Based on the following, the court agrees that

Plaintiff's claims for conversion and unfair and deceptive trade practices are

preempted by the Copyright Act and that Defendants are otherwise entitled to

summary judgment on Plaintiff's claim for breach of implied contract.

*1.      Preemption*

The Copyright Act preempts "all legal or equitable rights that are

equivalent to any of the exclusive rights within the general scope of copyright

. . . ." 17 U.S.C. § 301(a).  For preemption to apply, two requirements must be

met: "'First, the content of the protected right must fall within the subject matter of

copyright as described in 17 U.S.C. §§ 102 and 103.  Second, the right asserted

under state law must be equivalent to the exclusive rights contained in section 106

of the Copyright Act.'"  *Sybersound Records, Inc. v. UAV Corp.*, 517 F.3d 1137,

1150 (9th Cir. 2008) (quoting *Downing v. Abercrombie & Fitch*, 265 F.3d 994,

1003 (9th Cir. 2001)).  "The rights protected under the Copyright Act include the

rights of reproduction, preparation of derivative works, distribution, and display."
*Altera Corp. v. Clear Logic, Inc*., 424 F.3d 1079, 1089 (9th Cir. 2005) (citation omitted).

Here, there is no question that Plaintiff's *Gold of the Khan* falls within the subject matter of copyright.  Thus, the question is whether Plaintiff seeks to vindicate a right that is equivalent to the rights afforded by § 106 of the Copyright Act.  The court addresses each claim in turn.

a.     Conversion

The common law claim of conversion involves the "wrongful dominion over the property of another."  *Matsuda v. Wada*, 101 F. Supp. 2d 1315, 1321 (D. Haw. 1999) (citing *Tsuru v. Bayer*, 25 Haw. 693, 1920 WL 830, at *2 (Haw. Terr. Dec. 18, 1920)); *see also Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902, 914 (9th Cir. 2008) (stating that "to establish conversion, a plaintiff must show (1) his ownership of or right to possess the property at the time of the conversion, (2) that the defendant disposed of the plaintiff's property rights or converted the property by a wrongful act, and (3) damages").

"While conversion is generally immune from preemption because it involves tangible property, conversion actions seeking only damages for reproduction of the property -- not return of tangible property -- are preempted by

40

the Copyright Act." *Mktg. Info. Masters, Inc. v. Bd. of Trs. of Cal. State Univ. Sys.*, 552 F. Supp. 2d 1088, 1098 (S.D. Cal. 2008) (citing *Firoozye v. Earthlink Network*, 153 F. Supp. 2d 1115, 1130 (N.D. Cal. 2001)); *Cf. Oddo v. Ries*, 743 F.2d 630, 635 (9th Cir. 1984) ("Conversion of tangible property involves actions different from those proscribed by the copyright laws, and thus is not preempted.").

As alleged in the Complaint, Plaintiff's conversion claim alleges that "Defendants have intentionally exercised complete dominion and control without authorization over Plaintiff's copyrighted literary work," Compl. ¶ 43, and seeks "to recover the full value of the intellectual property." *Id.* ¶ 48. The rights asserted in Plaintiff's conversion claim are therefore the same as those protected by the Copyright Act.

In opposition, Plaintiff argues that he can state a claim based on Defendant's conversion of Plaintiff's ideas that do not rise to the level of being afforded copyright protection. The court rejects this argument. While the Ninth Circuit has not directly addressed this issue, the court agrees with the number of other circuits that have rejected this argument because the "scope of the Copyright Act's subject matter is broader than the scope of the Act's protections." *Wrench LLC v. Taco Bell Corp.*, 256 F.3d 446, 455 (6th Cir. 2001); *see also Nat'l Basketball Ass'n v. Motorola Inc.*, 105 F.3d 841, 849-50 (2d Cir. 1997) (holding

that subject matter of copyright under § 301 includes "uncopyrightable" as well as "copyrightable" elements); *United States ex rel Berge v. Bd. of Trs. of the Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997) (finding that "scope and protection are not synonyms," and holding that uncopyrightable ideas that make up copyrightable works are within subject matter of copyright); *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1453 (7th Cir. 1996) (finding that uncopyrightable data underlying a copyrightable computer program are within subject matter of copyright); *see also Meridian Project Sys., Inc. v. Hardin Const. Co.*, 2006 WL 1062070, at *4 (E.D. Cal. Apr. 21, 2006); *Firoozye*, 153 F. Supp. 2d at 1124.[11]  The court therefore GRANTS Defendants' Motion for Summary Judgment on Plaintiff's conversion claim.

   b.    *Unfair and deceptive trade practices*

   A claim for unfair and deceptive trade practices in violation of Hawaii Revised Statutes ("HRS") § 480-2 requires a plaintiff to prove "(1) a violation of

---

[11] Plaintiff cites to *Dunlap v. G&L Holding Group*, 381 F.3d 1285 (11th Cir. 2004), as supporting that "state law can protect the intellectual property contained in ideas that are not protected by copyright law." Pl.'s Opp'n 29.  *Dunlap*, however, does not counsel against preemption under the facts of this case.  *Dunlap* presented the issue of whether the misappropriation of an idea -- that a bank should cater to gay and lesbian customers -- could be a basis of a state law claim even though it was not by itself subject to copyright protection. *Dunlap* found that misappropriation of an idea could form the basis of a state law claim because 17 U.S.C. § 102(b) substantively excludes ideas from copyright protection, as compared to 17 U.S.C. § 102(a), which lists works of authorship that are substantively capable of receiving protection. *Dunlap*, 381 F.3d at 1295.  Plaintiff's *Gold of the Khan* falls under § 102(a), which specifically lists literary works, as opposed to § 102(b), which specifically excludes ideas.

HRS § 480-2; (2) injury to the consumer caused by such a violation; and (3) proof of the amount of damages." *Davis v. Wholesale Motors, Inc.*, 86 Haw. 405, 417, 949 P.2d 1026, 1038 (Haw. App. 1997).

The Complaint alleges that Defendants' actions "constitute unfair and deceptive trade practices in violation of HRS § 480-2." Compl. ¶ 52. Other than alleging that Penguin had to act in good faith to evaluate Plaintiff's manuscript, the § 480-2 claim merely incorporates the allegations supporting Plaintiff's copyright infringement and conversion claims. Given that Plaintiff's unfair and deceptive trade practices claim relies expressly on Plaintiff's allegations of copyright infringement (and those for conversion, which are equivalent), this clam "is based solely on rights equivalent to those protected by the federal copyright laws." *Kodadek v. MTV Networks, Inc.*, 152 F.3d 1209, 1213 (9th Cir. 1998); *see also Blue Nile, Inc. v. Ice.com, Inc.*, 478 F. Supp. 2d 1240, 1249 (W.D. Wash. 2007) (finding plaintiff's claim under Washington's Consumer Protection Act preempted because it is based on the same allegations as the copyright infringement claim). Indeed, reading the Complaint liberally, Plaintiff's § 480-2 claim is based on Defendants' solicitation for manuscripts and then alleged misappropriation of protected aspects of *Gold of the Khan*, and Plaintiff offers no argument why these claims are not equivalent. Plaintiff's claim for violation of § 480-2 is preempted

by federal copyright law.[12]  The court therefore GRANTS Defendants' Motion for

Summary Judgment on Plaintiff's claim for unfair and deceptive trade practices.

> c.      *Breach of implied contract*

In general, a breach of implied contract claim requires a plaintiff to

show "that the plaintiff prepared the work, disclosed the work to the offeree for

sale, and did so under circumstances from which it could be concluded that the

offeree voluntarily accepted the disclosure knowing the conditions on which it was

tendered and the reasonable value of the work."  *Grosso v. Miramax Film Corp.*,

383 F.3d 965, 967 (9th Cir. 2004), *amended* 400 F.3d 658 (9th Cir. 2005)

(providing elements under California law).  The implied promise to pay is an

"extra element" for preemption purposes because "'[t]he contract claim turns not

upon the existence of a [copyright] . . . but upon the implied promise to pay the

reasonable value of the material disclosed.'"  *Id.* at 968 (quoting *Landsberg v.

Scrabble Crossword Game Players, Inc.*, 802 F.2d 1193, 1196 (9th Cir. 1986)).

The Complaint alleges this "extra element" by asserting that "Plaintiff and

Defendant Penguin fully understood and expected that, should Defendant Penguin

---

[12]  Plaintiff argues that he is asserting a claim both for unfair and deceptive trade
practices as well as for unfair competition.  Regardless of how Plaintiff couches this claim, the
court finds it is equivalent to his copyright infringement claim and preempted by federal
copyright law because it is based exclusively on the same allegations as his copyright
infringement claim.

use Plaintiff's literary work, Defendant Penguin would compensate Plaintiff for the reasonable value of Plaintiff's literary work."  Compl. ¶ 57.

Defendants argue that summary judgment is nonetheless proper on this claim because "Plaintiff fails to make any showing as to what would constitute an 'extra element' that distinguishes this claim from the copyright infringement claim."  Defs.' Reply 32-33.  Defendant confuses the relevant inquiry -- for preemption, the issue is not whether Plaintiff has raised a fact issue supporting the elements of the claim, but rather whether the two claims are equivalent.  *See*, *e.g.*, *A Slice of Pie Prods., LLC v. Wayans Bros. Entm't*, 487 F. Supp. 2d 41, 51 n.8 (D. Conn. 2007) ("Defendants' contention that there is insufficient evidence to establish such a bilateral expectation of compensation relates to the merits of their summary judgment motions seeking dismissal of the breach of implied contract claim, but does not establish preemption of the claim.").  Accordingly, Plaintiff's breach of implied contract claim is not preempted.

### 2.   *Merits of Plaintiff's Breach of Implied Contract Claim*

Defendants argue that they are entitled to summary judgment on Plaintiff's breach of implied contract claim because, among other reasons, there is no evidence that they misappropriated Plaintiff's work in any way.  The court agrees.

"[T]o support a claim for breach of implied contract, a plaintiff must demonstrate a 'use' that violates the implied contract." *Benjamin v. Walt Disney Co.*, 2007 WL 1655783, at *9 (C.D. Cal. June 5, 2007) (citing *Mann v. Columbia Pictures, Inc.*, 128 Cal. App. 3d 628, 650, 180 Cal. Rptr. 522 (1982)).  As alleged in the Complaint, the "use" that violates the implied contract is Defendants' alleged "us[e] or facilitat[ion of the use] of substantial protected elements of Plaintiff's literary work . . . ."  Compl. ¶ 58.  In other words, the Complaint alleges that Defendants improperly used elements of *Gold of the Khan* that are protected by copyright law.  As described above, however, Plaintiff has failed to show that *Gold of the Khan* is at all similar to the Cussler Books in their protected elements. Plaintiff therefore cannot establish this element of his breach of implied contract claim.  *See also id.* at *10; *A Slice of Pie Productions, LLC*, 487 F. Supp. 2d at 52 ("[G]iven the Court's assessment of lack of substantial similarity between the works with respect to, inter alia, their respective plots, elements, and themes, which assessment is used to infer use, plaintiff has insufficient evidence of use by defendants of plaintiff's screenplay and/or the ideas therein [to support a breach of implied contract claim]."); *Arpaia v. Anheuser-Busch Cos.*, 55 F. Supp. 2d 151, 162 (W.D.N.Y. 1999) (granting summary judgment on breach of implied contract claim where there was no similarity between works that would support copyright

46

infringement claim and where complaint did not allege use of uncopyrightable elements).

During the hearing, Plaintiff asserted that his breach of implied contract is based not only on Defendants' alleged use of elements protected by copyright law, but also on Defendants' alleged use of elements that are not unique enough to receive copyright protection.  As described above, however, the Complaint includes no such allegation and thus, such claim is not properly before the court for purposes of summary judgment.  *See Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1080 (9th Cir. 2008) ("[O]ur precedents make clear that where, as here, the complaint does not include the necessary factual allegations to state a claim, raising such a claim in a summary judgment motion is insufficient to present the claim to the district court."); *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292 (9th Cir. 2000) (holding that where the plaintiffs advanced an additional theory of liability for the first time in their motions for summary judgment, the defendants were not put on notice of the need to defend against that claim, and the district court did not err in not allowing that claim to proceed).

The court therefore GRANTS summary judgment to Defendants on Plaintiff's breach of implied contract claim.

## V.  <u>CONCLUSION</u>

Based on the above, the court GRANTS Defendants' Motion for

Summary Judgment.  The Clerk of Court is ordered to close this case.

IT IS SO ORDERED.

DATED:  Honolulu, Hawaii, November 23, 2009.



<u>/s/ J. Michael Seabright</u>
J. Michael Seabright
United States District Judge

*Doody v. Penguin Group (USA) Inc. et al.*, Civ. No. 08-00285 JMS/BMK, Order Granting Defendants' Motion for Summary Judgment

48